J-S57001-19

2020 PA Super 49

| IN RE: R.A.M.N., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: LCCYS | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 750 MDA 2019 |

Appeal from the Decree Entered April 29, 2019
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-8687

| IN RE:  F.A.N., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: LCCYS | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 778 MDA 2019 |

Appeal from the Decree Entered April 29, 2019
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-8686

BEFORE:  BOWES, J., STABILE, J., and MUSMANNO, J.

OPINION BY BOWES, J.:　　　　　　　　**FILED: MARCH 5, 2020**

In these consolidated appeals, Luzerne County Children and Youth Services ("CYS") appeals from the April 29, 2019 decrees denying its petitions to terminate the parental rights of K.N. ("Mother") to her two minor children, F.A.N. and R.A.M.N.  We affirm.

F.A.N. and R.A.M.N. were born during July 2006 and December 2009, respectfully.  Their third sibling, C.N., died on January 4, 2013, due to a

traumatic head injury that she suffered while in the care of Mother and/or Mother's former paramour. CYS immediately placed F.A.N. and R.A.M.N. in care. The juvenile court adjudicated F.A.N. and R.A.M.N. dependent on January 9, 2013. On December 14, 2017, the juvenile court entered an order finding Mother responsible for C.N.'s death by act of omission because she failed to protect the child from harm. However, neither Mother nor her former paramour, in whose care she left her daughter before she went to work that day was charged with a criminal offense.

The orphans' court succinctly summarized the relevant procedural history as follows:

> [The children] have been in placement for six (6) years and have been most recently placed with their maternal great grandmother since March of 2019. Prior to March of 2019, the children were living with a traditional foster family . . . for the majority of their placement. The children were originally placed in January of 2013 because [CYS] alleged that Mother was a safety threat to the children in light of Mother not offering a "plausible" explanation for [C.N.'s] death on January 4, 2013. . . . Within the last three and [one-]half . . . years, Mother had expanded visits with her children commencing with supervised visits and concluding with unsupervised overnight visits with the children every weekend.

Trial Court Opinion, 7/17/19, at 3 (citations omitted).

On March 20, 2018, CYS filed petitions to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511 (a)(8).[1] CYS alleged, *inter alia*, that the

---

[1] The orphans' court appointed Joseph Mashinski, Esquire, as both legal counsel for the children pursuant to § 2313(a) and guardian *ad litem*. As F.A.N. and R.A.M.N. desired to reunite with Mother, the certified record does not reveal a conflict between their legal interest and counsel's advocacy in

conditions that led to the placement of F.A.N. and R.A.M.N. continued to exist. As articulated by CYS, because Mother cannot or will not explain how C.N. sustained her fatal injuries approximately six years earlier, she remains a threat to the children's safety. N.T., 1/22/19, at 84-85. As stated in its brief, the gravamen of CYS's position is that Mother "continues to be a safety threat in [her] home . . . [until she] provide[s] a plausible explanation as to how the [child] sustained the fatal injuries." CYS brief at 13.

On May 21, 2018, CYS filed concomitant petitions to change the permanency goals for both children from reunification to adoption. The trial court consolidated CYS's termination and goal-change petitions for disposition. During the ensuing hearings, Allison Miller, the CYS caseworker who was assigned to the family since 2016, confirmed that Mother exercised unsupervised visits since January 2018, and since Thanksgiving 2018, Mother exercised periods of overnight visitation without incident. N.T., 1/22/19, at 27-28. Ms. Miller also stated that the agency had no safety concerns regarding Mother's unsupervised overnight visitations, and did not identify any concerns or hazards while the children have been in Mother's physical custody. *Id*. at 53. Nevertheless, invoking a "state safety manual," which CYS neglected to identify or present to the orphans' court, Ms. Miller explained that Mother's failure to proffer a "plausible explanation" rendered her a threat to the

_____

opposition to the termination petitions. *See In re T.S.*, 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (absent conflict between legal interest and best interests, it is not error for court to permit one attorney to represent both interests contemporaneously).

children's safety. *Id*. at 31-32. Thus, despite Mother's compliance with her reunification requirements, the family's progress toward reunification, and the absence of an actual safety concern, the agency sought to terminate Mother's parental rights. *Id*. at 40-42.

In addition, CYS called as a witness Paul Bellino, M.D., the expert in pediatrics and child abuse whose report was admitted during the 2017 child abuse proceedings against Mother and her paramour. Presently, Dr. Bellino testified that, based on the mechanics of the child's traumatic head injuries, it was probable that C.N. sustained the injury after Mother left the residence for the day, and C.N. was alone with the paramour. N.T., 4/2/19, at 35-36, 50-51. Dr. Bellino's physical examination of C.N. revealed pre-existing fractures in the child's ribs and arms when she presented to the hospital with the head trauma. *Id*. at 29-30. He continued, however, that he had no reason to doubt Mother's contention that C.N. looked healthy when Mother left for work on the day the child died. *Id*. at 37.

Following the close of CYS's evidence, Mother moved for a directed verdict, contending that the agency "offered no evidence or testimony regarding the second part of that 2511(a)(8) factor [(the conditions which led to the removal or placement of the child continued to exist)], and . . . that termination of parental rights would best serve the needs and welfare of the child." *Id*. at 54-55. In open court, the orphans' court granted Mother's petition, denied the petition to involuntarily terminate Mother's parental rights, and denied the requested goal change. *Id*. at 64-65. On April 29,

- 4 -

2019, the orphans' court entered an order formalizing its in-court ruling and directing that the children be returned to Mother at the close of the academic year, June 11, 2019. Trial Court Order, 4/29/19. CYS filed timely notices of appeal, which we consolidated *sua sponte*, and its concomitant statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

CYS presents a single issue for our review: whether the orphans' court erred in granting Mother's directed verdict and denying CYS's petition to terminate Mother's parental rights. CYS brief at 6. Mother filed a brief in support of the orphan's court's decision. While counsel for F.A.N. and R.A.M.N. neglected to file a responsive brief, he submitted a letter to this Court stating that the children joined Mother's brief.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, [47 A.3d 817, 826 (Pa. 2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id**. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id**. The trial court's decision, however, should not be reversed merely because the record would support a different result. **Id.** at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **See In re R.J.T.**, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009). Instantly, CYS sought to terminate Mother's parental rights pursuant to § 2511(a)(8), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

As it relates to the argument that CYS raises on appeal,

- 6 -

Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services.

*In re Z.P.*, 994 A.2d 1108, 1118 (Pa.Super. 2010).

The only component of § 2511(a)(8) at issue in this case is whether the reason for placing F.A.N. and R.A.M.N. in placement continues to exist.[2] The crux of CYS's position is that, considering the circumstances of C.N.'s death, including Dr. Bellino's testimony that C.N. had pre-existing fractures in her ribs and arms when she presented to the hospital, Mother's failure to provide a plausible explanation for C.N.'s fatal injuries demonstrated that the condition that led to the placement of F.A.N. and R.A.M.N. six years earlier continued to exist. CYS's brief at 11-13. For the following reason, we disagree.

In denying CYS's petition to terminate Mother's parental rights, the orphans' court reviewed the evidence adduced during the two termination/permanency hearings. Specifically, the court considered the testimony of Allison Miller, who confirmed Mother's participation in the court-

---

[2] CYS concentrates its argument in relation to the second prong of § 2511(a)(8), which is the component that the orphans' court found deficient. We observe however, that the agency's brief reiterates the identical assertion that Mother remains a safety concern in arguing in favor of the third prong of the subparagraph, *i.e.*, whether termination of parental rights would best serve the needs and welfare of the child. As the orphans' court's decision to deny the petition rested on the second prong, we will focus on the agency's argument in that context.

ordered services and her progression toward reunification. N.T., 1/22/19, at 40-41, 44-45, 90, 96. Similarly, Ms. Miller testified regarding the absence of safety concerns during approximately two years of unsupervised visitations. *Id*. at 91, 94, 101-103. As noted, *supra*, Dr. Bellino opined that, while the exact time of injury would be difficult to determine, he believed that the injuries occurred after Mother left for work. N.T., 4/2/19, 35-37.

The trial court processed the foregoing testimony and reasoned,

> In the case at bar, despite Mother's full compliance with the Court ordered services for three and [one-]half . . . years, [CYS] filed a petition to terminate mother's parental rights based on the fact that Mother did not give a "plausible" explanation as to how C.N. was fatally injured six (6) years ago. This [c]ourt finds that [CYS] had no intention whatsoever in returning the minor children to the Mother even though she has been compliant with all court ordered services. Despite the fact that Mother has an indicated status of abuse, Mother was never criminally charged with any wrongdoing. No further legal determination was made as to who injured . . . C.N. The closest to determining who injured the child is reliance upon Dr. Bellino to ascertain the approximate time of the injury based on its severity. In Dr. Bellino's medical opinion, . . . it was more likely that the child was injured after 6:00 a.m. on the date of the child's death. Mother was not home at 6:00 a.m. because she left for work at 5:00 a.m. Therefore, it can be deduced that Mother would not have been home when the child was injured. The [c]ourt finds that Mother fully complied with the family service plan. [The reunification counselor] has stated that she had no concerns with Mother being with her children on an unsupervised basis. **Mother can never remedy the condition which gave rise to placement. She cannot give life to her daughter who died a tragic and unexplained death**. The court notes that there is truly no applicability of the facts in this tragic case to the sole ground, 23 Pa.C.S. Section 2511 (a)(8), upon which [CYS] filed an involuntary termination of parental rights petition in this case. **To follow [CYS's] argument, Mother is expected to admit to killing her child in order to "remedy" the condition that gave rise to placement**. Surely,

that is not a "remedy" contemplated by the legislature or the judiciary as it relates to 2511 (a)(8). The agency failed to meet its burden because the applicability of 2511 (a)(8) to this case is without merit.

Trial Court Opinion at 19-20 (emphases added).

Our review of the certified record supports the orphans' court's conclusion that CYS failed to satisfy its burden of proving the statutory grounds to terminate Mother's parental rights pursuant to § 2511(a)(8). As we highlight *infra*, the testimony does not sustain the agency's assertion that the conditions that led to placement continued to exist.

Without question, there is no factual basis for the agency's assertion that the conditions that preceded the placement of F.A.N and R.A.M.N. still exists. CYS does not assert that Mother represents a current risk to her children's safety. To the contrary, the agency's case rests entirely upon the fact that Mother has yet to proffer a "plausible explanation," which CYS believes is required by a safety manual that it never fully explained to the orphans' court or sought to admit into evidence.[3]

_____

[3] To the extent that the agency's cryptic references to the "safety manual" refers to Pennsylvania's Safety Assessment and Management Process ("PSAMP"), its rote application of that manual is inappropriate. The PSAMP is a guidebook that "provides reference material regarding . . . the in-home and out-of-home care processes **to assist the transfer of knowledge gained from training to actual casework practice**." The Safety Assessment and Management Process Reference Manual, Rev. 11/27/12 at 4 (emphasis added). Importantly, however, the prefatory section of the manual titled "Purpose and Discussion" directs that agencies utilize the manual as a tool to make an informed decision. Indeed, the pertinent section reads, "A safety

While CYS is resolute that the predicate condition persists because Mother is unable or unwilling to proffer a plausible answer for her daughter's tragic death, the agency neglected to present any evidence to demonstrate that Mother will actually fail to protect F.A.N. and R.A.M.N. At its core, CYS's positon ignores that the predicate condition to be remedied pursuant to § 2511(a) is Mother's alleged failure to protect her child, and not her lack of explanation for the injuries. As the trial court observed in its summation, CYS's perspective creates a standard that is impossible to satisfy. If Mother had a plausible explanation for C.N.'s injuries, the juvenile court would not have adjudicated her a perpetrator by omission in the first instance. She would have been held blameless. The agency's preoccupation with a "plausible explanation" for C.N.'s injuries in the current case is centered on its unfounded distrust of Mother rather than any evidence that Mother will fail to

_____

assessment and management system is reliant on good social work practice and is congruent with family-centered and strength-based practice. The County Children and Youth Agency is **responsible for making an independent judgment regarding the child's safety**." *Id*. at 5 (emphasis added).

Hence, presuming, *arguendo*, that Ms. Miller was referencing the PSAMP for the proposition that Mother was required to provide a "plausible explanation" for her daughter's injuries in order to be considered to have remedied the conditions that led to the placement of F.A.N. and R.A.M.N., the orphans' court did not err in rejecting CYS's position. Clearly, the manual does not require the agency to demand anything of Mother. By its own terms, the guidebook is a resource for agency to utilize in making an "**independent judgment regarding the child's safety**." *Id*. (emphasis added). Unfortunately, as evidenced by Ms. Miller's mechanical reliance upon a manual, there was a dearth of independent judgment exercised by CYS regarding the safety of F.A.N. and R.A.M.N. in this case.

protect her remaining children. Undeniably, the record bears out that Mother poses neither a present nor imminent danger to the wellbeing of her children.

Beyond Mother's statement that C.N. was not evincing any injuries when she left C.N. in her prior paramour's care before going to work, Mother cannot positively identify the former boyfriend as the perpetrator of child abuse. She can merely implicate that individual, who was never charged with the homicide, as a potential explanation for the injuries because he was the only adult known to be present during the period that the injuries occurred. Regardless, CYS specifically rejected the idea that Mother's limited account of the incident constituted a plausible explanation for the fatal injuries. N.T., 4/2/19, at 17.

The following exchange occurred during Ms. Miller's cross-examination.

Q. What does mom have to do to satisfy that manual [so] that she should know what happened to the children even if she doesn't?

A. That—I don't want mom to make up an answer as to what potentially could have happened, but I think having a plausible explanation as to how [C.N.] sustained all those significant injuries, then that would alleviate the safety threat.

N.T., 1/22/19, 42.

Later, the children's legal counsel inquired of Ms. Miller, "I'm asking how do we reconcile this? There's no active safety threat in the house, yet there's this overarching safety threat. How do we remedy that? How do we get past that? How do we reconcile that?" *Id*. at 103. Tellingly, the caseworker responded, "I don't know." *Id*.

Moreover, the certified record does not support CYS's insinuation that Mother is a safety hazard because she was present when the child abuse occurred. The juvenile court adjudicated Mother a perpetrator **by omission**, as opposed to commission, based on her failure to remove the child from harm's way rather than any intentional or reckless act that she committed. More importantly, Dr. Bellino testified that Mother probably was not home when the abuse occurred. By necessity, CYS's position implies that Mother assumed an active role in the child abuse and the only way that she can remove that taint is to confess her involvement. In fact, when the orphans' court was attempting to comprehend precisely how CYS expected Mother to demonstrate a plausible explanation under the circumstances of this case, the agency discounted the notion that Mother's paramour perpetrated the abuse while Mother was at work. It explained,

> Your Honor, based on the fact that it's been six years and that has never been offered, and now today at the termination of parental rights hearing that would be offered as the plausible explanation **while natural mother was home with the child for a period of that time and could have caused the injuries herself**, and the child had prior injuries prior to being seen at Geisinger, the agency wouldn't accept that as a plausible explanation today just for her to say, it was this individual now, six years later.

N.T., 4/2/19, at 17 (emphasis added). CYS never indicated what explanation Mother could possibly proffer to demonstrate that she was able to remedy the condition that led to the placement of her children.

Thus, for all of the foregoing reasons, we conclude that the orphans' court did not err in rejecting CYS's mechanical application of one isolated

- 12 -

component of a manual to conclude that Mother remained a safety risk despite an overabundance of evidence to the contrary.

Finally, while not included or even fairly suggested in the agency's statement of questions involved, CYS asserts in its brief that the orphans' court erred in considering the lack of an adoptive resource in denying its petition. CYS's brief at 14-15. The gravamen of this argument is that the Adoption Act does not require an agency to aver that an adoption is contemplated. *Id*. at 15. This issue is waived. *See Boutte v. Seitchik*, 719 A.2d 319, 326 (Pa.Super. 1998) ("issues that are not set forth in the statement of questions presented or reasonably suggested thereby are deemed waived"); *see also* Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

Moreover, the claim is meritless. While CYS's statement of the law is accurate insofar as an agency is not required to identify an adoptive resource in seeking to involuntarily terminate parental rights, the orphans' court did not consider the dearth of pre-adoptive resources in that manner. If anything, the court highlighted that, when the prior foster family requested that CYS remove the children from their home, CYS squandered an opportunity to return F.A.N. and R.A.M.N. to Mother's home under its supervision. Instead of encouraging reunification, CYS placed the children in formal kinship care with their maternal great-grandmother, a move that continued to place

restrictions on Mother's contact with her children. **See** N.T., 4/2/19, at 71 ("The designation of formal kinship prevents [M]other from spending the night at the caregiver's house."). In light of the orphans' court's prevailing desire to expedite the family's reunification, the court did not abuse its discretion in considering CYS's decision to place the children with their great-grandmother, rather than returning them to Mother at an earlier point in time. **See** Trial Court Opinion, 7/17/19, at 22. ("The outcome in this case affords [the children] the chance to live the remaining years of their childhood with their Mother . . . as has been recommended by the . . . reunification therapist and a licensed clinical psychologist who [CLS] chose not to call as a witness"). No relief is due.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/05/2020